Good morning, Your Honor. James O'Brien for Otay Land Company and Flat Rock. I'll refer to both companies as Flat Rock during the oral argument, unless I distinguish them. Your Honor, I'm at the council table with Mr. Robert Shoecraft, who will address any questions on the attorney's fees and cost questions, should they come up. You represent the developer, right? Yes, well, they're all developers in this case, Your Honor. Both the U.E. defendants are developers. It's hard to keep straight because of all the briefs. It's the present owner that wants to develop the land versus the former owners who ran a trap and skeet shooting range there, isn't it? That's true, Your Honor, but they were also developers. I mean, just for clarity, but yes. Being a developer is not a bad thing. I'm just trying to be clear. No, very true, Your Honor. Pardon me for being too literal, but that is true. We are a developer, and the former owners and operators are also developers. Your Honor, there are four issues this morning, which are identified by both Flat Rock and by the Amicus State of California Sierra Club and NRDC. If I may, I'd like to start with one of the issues, which is that there was no search and release into the environment. And, Your Honor, I think it might help for the oral arguments in this case, if Your Honors would allow it, if I might use the easel to simply draw a very basic property diagram and the main features of that, which will take about 20 seconds. I think a lot of the argument will be much clearer if I can, and I'll make my comments as I draw it. And I've asked for permission. I think there's no objection. Okay, go ahead. Your Honor, parcel A, which is the subject of this appeal, is shaped basically like this. The main features of the parcel, which will be discussed during oral argument, are the wood pile, the river basin, the crab and skeet range, which is here, and the berm, which is shaped like that, roughly right along in here. Between the shooting range proper and the berm, there is a lower elevation floodplain, and there is a slope here going down from the berm, from the shooting range, into the floodplain. There has been no reclamation of any kind of any of the hazardous substances in this area for a number of reasons, including that this is a Washington floodplain. Also, the machines can't operate on this slope, so when you hear about the disking in this case, the disking and the grading is there. Obviously, there is some grading down there to create the berm as well. And, Your Honor, the evidence in this case shows, and the evidence in the court's own order, the district court's own order, show that there are metals and other ones. Metals and other contaminants in the wood pile, there is lead on and under the floodplain. There are polyaromatic hydrocarbons, including the glycine and benzoyl-A-thymine, here on the floodplain, and there is lead, polyaromatic hydrocarbons, and perchlorate here on the shooting range. Also, in the groundwater under this site, there is lead and perchlorate. Our consultant takes the view that it didn't come from the site, but the agency so far disagreed, and we are doing testing in the groundwater under this site, Your Honor, as well at the moment, as part of the response. Even though we're only consulting with one person, there is action. Also, the agency believes, and our consultants believe, that lead here is a threat to the river and the surface water, although there has been no lead found in the surface water. So those are the basic facts, Your Honor. With respect to there being no release, in a nutshell, Your Honor, the district court believed erroneously that for there to be a release on this site, there has to be contamination beyond the boundaries of the site. And that is inconsistent, Your Honor, with the consistent holdings of this circuit. In the Chapman case, in the A&W filter case, A&W smelter case, which Your Honor authored, and in the Pucas case, all of them involved releases of various types of hazardous substances on site. Help me a little with the definition of facility. Yes, sir. This one's a real conundrum for me. A facility is an area where hazardous substance has been deposited. That's right, Your Honor. However, there is an exception. It does not include any consumer product and consumer use. That's not a facility. Now, to me, reading it, if I read one half and not the other half, I think, well, the lead shot and the shotgun shells and the clay pigeons are consumer products and consumer use. However, the land is not a consumer product and consumer use because it's funny to call land a product. Ordinarily, a product is personal property. However, when I read that phrase in context, it's hard to see how anything could fall within the exception unless land is a product. And all these things that are facilities, they couldn't possibly be consumer products and consumer use if consumer products don't include realty and fixtures affixed to the realty. Your Honor, let me help you. I'm just having trouble making sense of it unless I treat a trap shooting range and not just the shotgun shells and pellets and clay pigeons as consumer products and consumer use. Your Honor, I think if we look to the reasoning of both the Court in Amtas and Uniloyal, the answer to the question is clear, at least to me. And I think it will be to the Court as well. Explain it to me. The facility here for the consumer product exception to arise, the consumer product must be the facility. Now, there are lots of things that might be facilities except for the consumer product exception, which to me makes complete sense. The one the EPA gave in talking with the representatives at Congress was a risk watch. A pond. A pond is one of the things listed here. That's right, Your Honor. No factory makes them. That's right. But radionuclides emitting from a risk watch would be a consumer product. It would be a release of hazardous substances. But there is no facility there. Probably the one that to me is most obvious is the watch. So Congress wouldn't have to write the exception in. The exception does not operate on the release of radioactivity from your watch. It has to operate on something. Let me give the most obvious example, Your Honor, the automobile. The definition of facility includes motor vehicles. But there is a type of motor vehicle, which is, in my view at least, although there's been no case to hold this so far, a consumer product. And that is your personal car. It's purchased in a retail store and is purchased for personal, household, or other use. So the automobile, Your Honor, is probably the best example. How would you deposit a hazardous substance into an automobile? There can be a release of a hazardous substance from an automobile. Sure, there always is. And, yes, Your Honor, there is that. And there's also, for example, a leaky battery. As was the ‑‑ and you want ‑‑ in the Gatellis case here, leaky batteries can be releases, can have releases of hazardous substances. Every automobile has a battery. So that's the situation, Your Honor. I think probably the best opinion, although the two circuits which have addressed this issue of what is a facility have both held, both the Fifth and the Seventh Circuit, that the consumer product must be the facility, no definition that they considered in determining what was a facility ever included a piece of real property as a consumer product. It's always tangible personality. So it's clear, Your Honor, I think, from the circuit law. It's very clear from the congressional hearings. And I also think it's clear from the BPA Best Management Practices Manual that a shooting range, that is to say a piece of land, an outdoor piece of land, is a facility, Your Honor. And if I may, if there are no other questions, just looking at my timing here, I'd like to move on to the disposal issue, Your Honor. I mean, if that's not a facility, then a gas station wouldn't be a facility either. A gas station, I think, would be. Because you've got consumer people driving in their personal cars. So you say a gas station is not a facility either. A gas station, Your Honor, is not something that someone would buy in a retail store. A gas station would not be something that someone would buy for household or recreational use. I would think, although. No, it's analogizing a gas station to a shooting range. I understand, Your Honor. Consumers bring their cars in there, and cars are not facilities, but the gas station is a facility. The gas station would certainly be a facility, Your Honor, and there are endless examples of where gas stations have been treated as facilities. That's right. Oh, yes. I agree. Sorry about those. Your Honor, turning to the question of whether or not there's been a disposal at this site, CERCLA says that the term disposal is defined the same way it's defined in the Solid Waste Disposal Act, which is part of RCRA. The Solid Waste Disposal Act says the deposit or placing of solid waste on land constitutes a disposal. The matter is solid waste if it is simply put onto the land. Here the district court said there are two reasons there's been a disposal. First, that there's been no disposal here because there has been recycling of hazardous waste, hazardous substances on this site. May I point out again, Your Honor, in looking at the diagram, that there has been no recycling or reclamation here, none on the wood pile, none on the Ojai River floodplain, none at the berm, and only sporadic attempts to recycle surficial lead on the shooting range. No attempt to recycle tally aerated hydrocarbons or the benzoate, a pyrene carcinogen, or propyrate on the shooting range. No attempt to reclaim or recycle the lead which is buried beneath the super. Can you bring your private action when you have not done the work and given notice and gotten public involvement? Yes, you can, Your Honor. The Dent and Russell case, the Dent and Russell case of this circuit, and the Ascon v. Mobile Oil case of this circuit from 1989 both say that as long as you have brought, as long as you have incurred at least some response costs, you may bring an action. And Dent and Russell said this is typical, and in my experience as an environmental lawyer, it's very typical too. You spent some response costs, but these responses often take so many years that it's unfair for the party to go through the entire process. But you have to involve the public too. I mean, one way you get some response costs is you hire an expert who gives you a really inflated figure, and then you sue everybody else who's a potentially responsible party and get lots and lots of money and then try to actually do the cleanup for a whole lot less than the original estimate. So, I mean, you have to be smart if you can get away with it. But the idea of getting the public involvement as I understand it is so that the other people who may get stuck with part of the bill can put on their experts who say, no, no, no, you don't have to haul the dirt and five-pound bags to Nevada. You can just do these much cheaper ways to clean it up. You, Your Honor, several points. First, public participation under the National Contingency Plan applies only to CERCLA, not the record cause of action. Secondly, public participation only operates at a certain stage of the investigation and cleanup proposal. There are two stages. There's the remedial three stages. There's the remedial investigation, the feasibility study, and the remedial action. No public participation is required at all under the NCP at the investigation phase. At the feasibility study phase, interviews are to be or contact is to be had between the responsible party cleaning up and the public agencies, the oversight agencies, and those who might represent people, representatives of the public in the area. And usually the public library is set up so that the investigative reports are sent there. That was done in this case, Your Honor. When a remedial action plan, which is in the future in this case, is done or proposed, and these are future events, then there is a public meeting and comment period and a responsiveness summary, which summarizes the responses of the proposed remedial action proponent to the public's comments. That is in the future. It isn't time for that yet. But to the extent the NCP applies to this matter, all of the NCP requirements have been satisfied to date. Counsel, in Enrydant, weren't the response costs incurred pursuant to an order from the EPA? Yes, there were, Your Honor. So how does that control this situation where there has been no EPA cleanup order? Why should we follow that ruling when the circumstances are different? Well, Your Honor, in this case, of course, Atlantic Richfield and the United States Supreme Court now says that those who are undertaking a voluntary cleanup may bring a Section 107 response cost action. What's the cleanup effort that's been incurred in this case? The cleanup effort, Your Honor, in this case has been something called site characterization and the preparation of a feasibility study. The site characterization includes taking a lot of soil and groundwater readings around the site, and then remedial alternatives are proposed in something called the feasibility study reports, and they are then submitted to the agency. Here there has been a slight delay because the agency, despite the thousands of samples that have been taken all over this property, their reaction is we might need to take more. Has there been any actual cleanup, any on-the-ground work in terms of cleaning up the property? There has been some very light preliminary removal activity on the groundwater. Some of the lead was removed early on using conventional equipment as part of a remedial effort, but the main remedial action has not yet begun, Your Honor. But the investigation I think now is complete, and I believe the feasibility study phase is about to be complete. So we're well into the process. We might be the remedial action on a site like this might only take a year or so, so we might be seven-eighths or nine-tenths done right now. Your Honor, with a look at the clock, let me turn quickly to the question of whether solid waste here existed under RCRA. We think, Your Honor, that the clean air decision of this Court applies. Certainly there is no situation here where there has been an immediate and continuous reprocessing of the materials on site, again, because in the river basin, the waste pile, the wood pile and the berm, there's been no recycling or reuse at all. As to the site itself, no recycling or reclaiming of PAH or perchlorate with respect to the lead on the site. Not only recycling the lead as much as they could. As I recall, they were gathering pellets the way little boys gather golf balls in a pond on a golf course and reselling the pellets. I don't think they did as much as they could, Your Honor. To the contrary, I think the fact that they disked and graded on the site actually made things far worse. The record, even the record adopted by the District Court, Your Honor, shows that. The consultant, Gary McHugh, who the Court cites in its own order granting summary judgment, testified or submitted testimony that was referred to by the Court in the summary judgment order that disking spreads the contaminants on the surface of the shooting range both vertically and horizontally. So that's not as much recycling as they could, Your Honor. They made it much worse. And the seducing we urge on the Court, Your Honor, is the same as in Connecticut Coastal Fishermen's Association. This waste has accumulated for up to 43 years, Your Honor, and it's certainly accumulated far long enough to be a solid waste. Your Honor, with three minutes to go in my time, I will now stop. Thank you. Thank you. We'll hear from the other side. Thank you. Good morning, Your Honor. Mark Dillon appearing on behalf of the defendants and appellees in this case. I would like to start by directly answering the question I just heard one of the justices ask, and that was whether there has been any actual remediation on site. And the answer to that question is no. There has been no actual remediation on the site from 1998 when Otay Land Company acquired this property to the present, 2008. That's a 10-year period. And the lead reclamation that occurred by Otay Land Company was not a remediation effort. That was a lead reclamation effort where they pulled 42 pounds of lead from this site and made a profit in doing so. You mean they were mining the site for lead? Exactly. Selling lead? That's what they were doing. It was not a remediation, and the facts are clear on that. So that answers one question. Doubling back now to the application of the consumer products exception to this case, it is applicable. It does exclude a shooting range as a circular hazardous waste facility because it is a site where lead shot, clay target debris, consumer products came to be located as a result of recreational target practice. And it is undisputed that this range has always been used as a public shooting range for sport and recreation. Could you work through the language of this subsection 9 and explain how it works for this? It's easy for me to see where if somebody had gone out trap shooting and was brought in as a potentially responsible party, that he could get out of paying anything by saying, I paid my money to shoot. I was shooting my consumer product shotgun shells and consumer product clay pigeons. So I'm protected by the exception. But I'm having trouble reading the section and going through the grammar to figure out how it works either way on that shooting range. And again, what we're doing here, I think, is focusing on the term facility in CERCLA and its meaning. And one thing I would add, this district court took considerable care in analyzing that definition. And it focused on first. We have to review de novo, so make it easy for us. Sure. It focused first on the fact that facilities and the definitions do focus on places. They focus on places, locations. They don't focus on consumers. And there is an argument in this case by Otay Land that somehow the statute ought to be read as applicable only to consumers. And, you know, our best response to that is that the actual language of the statute, which should control, makes no such distinction. It focuses upon places. Well, your adversaries pointed out that three of the things, most of it's places. It's real estate. It's not personal property. Right. But three things are motor vehicles, rolling stock, and aircraft. And at least two of them, motor vehicles and aircraft, can be consumer products and consumer use. Well, and admittedly, Part A. Some are type of cod, not Alaska Airlines 737. I understand. And Part A is more descriptive, and it gives more descriptive examples of facilities. Part B is intended then to be the catch-all or any site or area where a hazardous substance has been deposited or placed or otherwise has come to be located. And where the exception comes into play is if you've got a site or an area where hazardous substances have come to be located that involve consumer products and consumer use. I get it. So what you're saying to me is I don't have to look at consumer product and consumer use and find a use for it in A, on aircraft and cars. Right. Because it's in B, not A. It's a Part B definition. Everything in B that it's an exception to is real estate. It's a site or area. There aren't any cars in Subsection B. So for the exception in Subsection B to do anything at all, it has to treat some sites or areas as consumer products and consumer use. Do I understand what you're saying now? You do. Okay, thanks. How does that apply to a Jiffy Lube? To a Jiffy Lube? Yeah. You drive your personal car in there, and you dump a bunch of oil, which they then put in a drum, and then they take it out in the back, and they dump it into a hole in the ground. Consumer facility. It's my private car. It's my personal car. So the Jiffy Lube facility is excluded under this reading as well, right? Your Honor, the Jiffy Lube facility is likely to be construed as a Part A building, and then put as a Part A building to the definition of facility. That would be my first response. I don't understand your first response at all. Okay. The term facility means. Let's talk about this provision that we have been talking about and not worry about whether it's covered by something else. So under your view, the Jiffy Lube facility would be excluded under this part, right? No, I'm not necessarily saying that. I'm saying that the Jiffy Lube may be a Part A facility under the definition, under Circular's definition of a facility. Then the question would have to be then raised, is this also. . . Why is the Jiffy Lube not a shooting range? How are they different? Well, the shooting range, again, serves only one purpose, and that is to provide a site or an area for consumers to go for sport or recreation to utilize their consumer products. The Jiffy Lube is there for one purpose only, and that is to dump my old oil and get fresh oil. I mean, they do the tires, and they do. . . But they don't do a whole lot of other things. They're no different than going to the shooting range and being able to buy, in addition to buying ammo, sometimes you can buy actual guns. Many shooting ranges have auxiliary facilities. You can buy slings for your, you know, that you use on your shoulders to keep. . . You know, they have. . . But the main thing they do there is shooting. The main thing they do at a Jiffy Lube is they dump dirty oil. And I'm just wondering how everything you say about your gun range doesn't apply to Jiffy Lube, too. Or maybe it does, and maybe the answer is Jiffy Lube is home free. The reason it doesn't, Your Honor, is the consumer that goes to Jiffy Lube doesn't dump its oil. The employees and business operators do that. The consumer that goes to the Jiffy Lube isn't going there putting it and actively using consumer products when it goes to Jiffy Lube. It's going there for a service. And I don't mean a. . . I mean a service. It's not putting. . . It's not putting consumer products in consumer use when it goes to the Jiffy Lube. So you think that the fact that the guy empties my oil is different than the dude who loads the clay's pigeons into the machine when they run out, and the guy who, when I say pull. . . You know about pull? I do. Okay. When I say pull, magically the clay pigeon goes out. I've always assumed there was a human being there who heard me say pull. It wasn't just done automatically, because I think there's a guy there with a plunger. So how is that different? How is the guy who loads the clay pigeons and ejects the clay pigeons and sells me the ammo there at the range, and when my gun jams, says hit the gun, don't point it at anybody, and does all those things, or when I don't wear my goggles or earmuffs, stops me from shooting. As I mentioned, it's different. It's a service, right? I don't go there. I don't go to a shooting range. It's a whole series of services they provide. They provide ammo. They often provide the guns themselves. Almost always they provide the guns that you can rent. You can bring your own, but they provide guns that you can rent. They certainly don't let you bring your own clay pigeons, and they don't say here toss them like frisbees. There's some guy with a machine there who loads them up and buys them, right? How is that different from a Jiffy Lube? I just want to get this from my head. Again, it's different from a Jiffy Lube because the consumer is taking his car there for a service. He is not engaging consumer products in consumer use. He is not going there for sport or recreation. He's not going there to get consumer products in consumer use. Would it matter? Would it matter? There are some places that operate facilities where you can do various types of things that are difficult to do at home because you don't have enough space or facilities or it's dirty or smelly or one thing or another. I don't know if this exists for oil changes or not, but suppose somebody just has a warm big garage so that when it's 40, 50 below, you can change your own oil, and they let you go in there and change your own oil. So you're really not buying a service. You're just picking up oil at Walmart and going into this real estate and changing your own oil. The oil is a consumer product. Your car is a consumer product, and nobody is rendering any service. How does it apply then? That to me is a little closer as compared to the Jiffy Lube because now we have a site. Hazardous substances are going to come to be located at that site, and consumer products are being in use. Consumer products are there in use by the consumer. So that one is a little closer to the shooting range setting. It's going to get real dirty. A lot of people are going to spill some oil. There's no dispute here that lead is a hazardous substance. So is that a facility or does it fall within the exception? I think in your situation, it could be better argued that it falls within the consumer product exception because it is a site used solely by consumers utilizing consumer products. It doesn't have any other service attributes. I think it comes closer to a shooting range setting because, again, like the shooting range, it's only there for one purpose. It's not there to provide a service. It's there to provide an opportunity for consumers to engage in sport and recreation. They bring their own shotguns. They bring their own shells perhaps, and they engage there in a sporting recreation. They are at a place where hazardous substances are expected to be. They're intended to be. What do you mean you don't bring your own shotgun and shell? Well, I was just in Idaho at the judicial conference, and I didn't have my shotgun with me. I just didn't bring it with me or any shells because it's sort of expensive to bring shells from Los Angeles. But I walked in with nothing, with my sons, and for $200, we were able to provide everything we needed. Shells, all the clay pigeons or whatever they're called, we wanted to. When we ran out of ammo, somebody came out and said more. I mean, how is that different? Your Honor, I didn't mean to infer that the operators didn't provide shotguns for rent or shells to purchase. I'm just saying every aspect of a shooting range, the guns rent or brought there, the shells rented or brought there, the clay targets used at the site, all of those products are consumer products used by consumers at a place or an area where hazardous wastes are expected. By that broad definition, what is not following the exception? I mean, let's say you've got a manufacturing plant and they produce all sorts of hazardous substances, but when they're all done, they provide these cute little QB dolls with bobble heads of vice presidential candidates that we've seen on television, right? You know, it's a consumer product, and all the people are there doing nothing but creating these consumer products. How is that different? Your Honor, there are several cases, Unirol and AMCAS are two, where the truck and the truck terminal was trying to be characterized as a consumer product and consumer use. And like the district court in this case, those are two examples where the consumer product exception would not apply to a truck filled with chemicals. It would not apply to the truck. But why not, according to your rationale? I mean, here they have a facility, they, according to your hypothesis, they rent the guns, they sell the ammo, they sell the clay pigeons, they operate the clay pigeons, right? They do all those things. Maybe not everything for every consumer, because there are some who bring their own guns, there are some who bring their own ammo, but they do every single one of those things. In what sense is that different from the truck that brings the Kewpie dolls or the Bobblehead dolls to the retail store to be sold? Because the truck is not considered filled with chemicals, it's not considered a consumer product, it's not being driven there by a consumer. The consumer is not putting the truck in use. The truck terminal is not... I understand perfectly well why the truck isn't. I'm just saying, how do you make your facility different from the truck? The people selling the ammo are not consumers. The people changing the clay pigeons aren't consumers. The people who rent the guns aren't consumers. I mean, this is a business. They're in there to make money servicing consumers, but they're not consumers themselves any more than the truck driver is a consumer. And what I believe the Court is focusing on is the use of consumers and perhaps the legislative history reference to consumers. But again, if this statute wanted to exclude consumers, it could have done so. It didn't. And we shouldn't be reading in a limitation that this exception only applies to consumers because it's nowhere to be found in this statute. Let me get some help on another issue before you run out of time. Sure. I had another case that this one reminded me of. And frankly, I can't remember the name, and I couldn't find it in time to prepare for argument. But you probably, you're an expert in this. You know more than I do. You'll remember it. It was some developers that bought what used to be a ranch. And the ranch had some tar pits. And during World War II, some waste was deposited in the tar pits. Everybody knew all about it. Asphalt covered the tar pits. Cows would wander out on the tar pits and fall in and get eaten by the acid. Well, when the developer bought the ranch, the developer got a discount because everybody knew about the tar pits. And there was going to be a big cleanup expense on account of all this old World War II stuff left at the ranch before they could put in suburban tract houses. And I remember agonizing about the issue. And I think in this case, it's the same thing. OTA knew perfectly well it was buying small shooting ranges. It would have a bunch of lead. So they probably got a discount since you can never count on recovering costs from prior owners. And I remember agonizing, and I can't remember what the result was. I'm thinking Cadillac Fairview, but that might have been a different one. Do you know what our circuit authority is now on the problem of double recovery because the buyer who seeks recovery against the prior polluters already got a discount on the purchase price because of the anticipated cleanup costs? First, I'm not aware of the case name, but it is analogous to this setting because OTAI Land, a developer, and certainly Scott and NS and UE are not developers. But in any case, getting back to your question, there we've got a situation that's very similar to this situation. OTAI Land acquired the property. It acquired over 4,000 acres of property. That's why I'm asking. It's a double recovery issue, and I'm wondering what law we have on it. It's kind of a Coase theorem problem. If we said it just doesn't matter that you already got a discount, then you wouldn't get such a big discount. Well, and there is good circumstantial evidence that can be inferred that there was a discount, and the evidence is that OTAI Land is $4,000 per acre. But what's our law? Again, Your Honor, as to that point, I'm not advancing that point as a reason, a double recovery. I'm not advancing that as a reason to also support the district court's opinion. And I apologize, but I'm not aware of the name of that case. So we've found that. Okay. I have been given a note, and apparently that case is Western Properties Service Corporation versus Shell Oil, a Ninth Circuit 2004 case found at 358 Federal Court of Third at 678. It was overruled on unrelated circular standing issues, but it is a situation where ---- I think AVIL might have changed it, the Supreme Court decision. That's probably right. AVIL. But on your point, I still think it's probably good law, and there was an appropriate discount or evidence of an appropriate discount. And the quote from that case is, quote, No sensible person would pay as much for a property with a known liability as for one without, whether the price expressly discounted for cleanup or not. And that's clear here as well. OTAI paid on the order of $4,000 per acre for Chula Vista property. They did so for the express purpose of developing that property for commercial active recreational uses. They knew what they were buying when they bought it. So, again, I do think that that has some application as long as we don't follow the standing concepts in that case. I'm probably getting short of ---- I'm showing about one minute. You're over your time. Sorry? You're two minutes over. I'm two minutes over. I'm sorry. I was reading the clock wrong. I didn't get to a number of issues, but I believe that maybe the time was best used trying to answer questions. Thank you. Okay. Thank you. Did you have something you wanted to add on that side? Yes, Your Honor. The court indicated that the court might have allocated a small amount of time. I would like to respond to your question, Your Honor, about the difference between shooting and chipping. I think I can answer that. Is there something different about your client than anybody else? Yes, Your Honor. My client is an operator, and he's not the same as a landlord. He's not a developer. He's strictly a leaser. All right. We'll give you two minutes. Thank you. May it please the Court, my name is John Frenney. I represent Appellee Ray Ennis. Your Honor, specifically with your question about the difference between a Jiffy Lube and a shooting range, at a Jiffy Lube, people go there specifically to dispose of oil. People aren't disposing of anything at a shooting range. They're participating in sport. They didn't go out and shoot at clay targets to dispose of the lead. They didn't go out and shoot at clay targets to dispose of the targets. You say that, but it's not true. I'm sorry? You say that, but it's actually not true. You do dispose of the lead. You walk in with lead in little neat packets, and you walk out, and the little neat packets no longer exist. They are now empty packets, and the lead is scattered all over the location. But that's not the intent, Your Honor. You're not sitting there and saying, I'm going to this facility to dump off my lead. That's not where you're going. The intent, the consumer is actually participating in the activity as it was intended to be participated in. You don't go to the Jiffy Lube saying, I'm going to dump off my oil. You're doing this saying, I'm going to go get clean oil for my car. I don't see a difference at all. Well, I understand where the courage is coming from, but I do see a significant difference. Going to the Jiffy Lube is now a recreational activity. You're going there specifically to get rid of a substance, to dispose of it. So what difference does that make? Well, that's the statute of the facility. No, no. You go there to get fresh oil and a fresh filter for your car. Now, it so happens that in order to get fresh oil in your car, you have to make room for it by removing some other oil. But I don't really want to get rid of oil when I go to the Jiffy Lube. What I want is fresh oil in my car. If I could magically change it so that the old oil in my car would become new, I would prefer that. It would save me a trip. And at the point you're getting rid of the oil, it's not a consumer product in consumer use. In fact, you're taking it out of consumer use when you're dumping it off. Whereas the lead pellets, once they leave my gun, are still consumer products? Absolutely. They're being used for their intended purpose. And the EPA has recognized that in the military munitions rule. They say that. That's exactly what it's for. It's not a solid waste. Even when it falls to the ground, it's not a solid waste. But when you take that oil to the Jiffy Lube and dump it off, it's waste. It's going to go get recycled or dumped or whatever. But that lead isn't being wasted, and the EPA has recognized that. Where does that military munitions rule apply? It's been cited and— I remember that. I couldn't figure out quite how broad it was, whether it had the effect of promoting shooting sports by saying long as it's shooting and it's okay, which would like the government policy. It is the military munitions rule, and it is something that was developed for military ranges because of the obvious problem. I remember reading it, and I can't remember the context, so I don't know how broad it is. Well, it's been cited in several of the cases that deal with shooting ranges. The Connecticut case specifically talked about this when they were talking about the difference between— whether the lead becomes solid waste. What does it say? Well, basically what it says is that the EPA does not consider the lead or the targets to be solid waste when they're being used for their intended purpose, even when they fall to the ground afterwards. So it's not a solid waste. And that's been cited in every case. Even in the Connecticut case, the issue there— You don't have a copy of the quote? I'm sorry. A copy of the quote or the rule you're on? The rule that I have— The rule, yeah. The rule I have attached to our brief, and it is at 40 CFR parts 260, 261, 262, 263, through 66 and 270. And it is in Appellee Ray Ennis' brief attached as the— They all look the same. To the appendix. And what does it say? Well, the military—the gist of the military munitions rule, Your Honor, is that while the shot— No, no, no, not the gist. What does it say? Okay. I beg the Court's indulgence here while I pull out the language that I quoted in the brief. What's your name? My name is—my client's name is Ray Ennis. I asked you what your name is. John Crony. I'm sorry. I thought you were looking for the caption to the brief. I asked you what your name is. Okay. Where in your brief is it? I'm sorry, Your Honor? Where in your brief is it? Exhibit what? It is Exhibit 5 to the brief, Your Honor. Uh-huh. Okay. I've got Exhibit 5. That's 42 U.S.C. 9613. It's statutes, not regulation. I have 40 CFR Parts 260, Your Honor. It's a rule. Exhibit 5? Exhibit 5, yes, sir. The rest of the brief. To Exhibit 6. I apologize. Okay. It's a rather lengthy rule. Read the good part. I'll try to find it quickly here. Looking at Subsection G1, Intended Use, which— G is when military munitions are not assaulted. Exactly, Your Honor. Under Subsection 1, it says, Under R.C.R.A., the use of products for their intended purpose, even when the use of the product results in deposit on the land, does not necessarily constitute discard, is not waste management, and is not subject to regulation. For example, R.C.R.A. does not regulate the use of pesticides. And then it goes on from there. I'm looking for the specific section where it discusses the use of the munitions themselves. And that appears later on. It says, In EPA's opinion, the use of a munition does not constitute a waste management activity because munitions are not discarded. Rather, the firing of munitions is within the normal and expected use of the product. This is the same position EPA took regarding the discharge of ammunition and expended cartridges in an interpretive letter by Sylvia Rolands, director of EPA's Office of Solid Waste, to Jane McGee. What did they say about clay targets? Well, Your Honor, they don't specifically – well, let me – before I say that, let me look. I know that they have discussed clay targets. And this is just R.C.R.A., right? I'm sorry? This is just R.C.R.A., right? Does this say anything to CERCLA? This is R.C.R.A. That's correct, Your Honor. It doesn't say anything about CERCLA. It really discusses the EPA's position on the use of targets. I think when we look – the difference between R.C.R.A., obviously, is we're talking about the definition of solid waste. When you go back to CERCLA, then you're talking about whether or not it's discarded. But it's the same proposition. You're saying that CERCLA would incorporate this R.C.R.A. exception for munitions. I'm saying it's analogous, Your Honor. The issue is whether it's discarded. And under R.C.R.A., it says it's not discarded under the military munitions rule. And that's the EPA's position. EPA enforces both. There would be no reason for them to take a different position. If they have a rule – I mean, the government can have a rule that Tuesday is Saturday. And if that's the rule, that's the law we follow, even if it doesn't make any sense. True. I think you're saying that they have a rule that when you discard lead into the shooting, you're not discarding lead into the source. That's right. That's exactly the gist of the military munitions rule and the sections that I've read to the Court. That's okay. And you've given us the cite now, so we can study it. Which means they don't need to clean up. Which means, Your Honor, that the – which means that CERCLA and R.C.R.A. don't apply. But that doesn't mean that there might be some other remedy. This is really about whether those two statutes apply. But in your reading, under CERCLA and R.C.R.A., they don't need to apply. They don't need to clean up. Under my reading of CERCLA and R.C.R.A., they do not have federal causes of action under those statutes, because those two statutes do not apply by their very terms. And the agency can't come after them. I'm sorry? The agency can't come after them because – The agency wouldn't come after them under that – EPA won't come after them under those statutes. The defense would still be good as to the EPA under the facts of this case, because those ranges were always operated as recreational ranges where people came to shoot their weapons and break targets, not to discard any type of lead or the clay targets. That's why it's an exception. And, Your Honor, the consumer product exception has no meaning if it doesn't apply in this case. It's to the contrary to what the Court said. It doesn't – this case doesn't concern a wide range of things that might fall under different sections of the statute. This case specifically hits the consumer product exception. And if – I was just thinking the other day, it's very apropos that here we are in September. The Dove season was just September 1st. And under – I don't know how I missed that. I don't know either. I know that you like to shoot, but the thing that I was saying about different examples of how following appellant's interpretation, there could be an enormous expansion of facilities. If a landowner says, well, you can go hunt on my property, is he now subject to circling RCRA? Because he said, you can go shoot on my property, knowing that they're going to shoot lead and it's going to land on the property. Is he now a PRP? I thought they don't shoot lead anymore. They don't at Waterfly, Your Honor, but at Doves and Upland Game, they still do. Most lead bullets that you shoot at deer, it's lead bullets. None of the ones I've shot at deer. Well, there are better substances, but still, there's still some of the old-timers that still don't load their own, and there's still .30-30 caliber ammo with lead in it. I didn't know there was anything else, actually, except for shooting ducks over ponds. That's what you use steel and non-toxic shot, but they have not expanded that to everything. You can still buy lead, and at the Olympic Games, they still use lead. I mean, lead is – if you go to Walmart and you ask for shotgun shells, you're going to get lead unless you ask for something else. So there's a big difference between the types of facilities that the court was asking about and this case, this particular type of facility. Okay. Thank you. Thank you, Your Honor. You have some time left for another. I didn't quite hear you say how much time I had left. I said some. Okay. Thank you. Thank you, Your Honor. I think you should look down and you will see the number. If the farmer sells land to a developer, can the developer sue the farmer for the cleanup costs because the farmer's been letting people shoot grouse on his land every fall? Yes, Your Honor. Under those facts, he can. And, Your Honor, the principles that you might be concerned about, the equitable principles, of course, are taken into account. Under CERCLA, equity may be considered in allocating the response cost responsibility and it's very possible for a party to get a zero allocation. Your Honor, if I may, I'd like to address very quickly three points. The military munitions rule, Your Honor's point about a discount, and the Jiffy Loop question. First, with respect to the military munitions rule, it is no help to us in this case. First, because the military munitions rule expressly applies only to military munitions. Secondly, and extremely importantly, it relies on the retro-regulatory definition of CERCLA waste, pardon me, of solid waste under Section D of CERCLA rather than the statutory definition of solid waste under Section G of RECRA. And as the Connecticut Coastal Fishermen's case said, in the Second Circuit, it's the very broad statutory, not the narrow regulatory definition of solid waste, that applies to an endangerment case like ours. Secondly, Your Honor... There is something, the idea that when you shoot lead, you shoot a gun, it's not quite the same as taking garbage out and dumping it. You know, it's a different kind of activity. You know, dumping the garbage or getting rid of garbage, or let's say I secretly change oil to my car in my driveway and then I sneak up to the sewer. I don't do this. It's crossed my mind, but I refrain. But, you know, now you've got this container of dirty oil and the temptation is to go up and dump it into the sewer, right? And of course, would be highly illegal. And that's really quite different. I mean, that is different from shooting, where you're really not dumping. The fact that the lead pellets fall to the ground is sort of an incident of the activity, but what you really are out to do is to demolish that clay pigeon. Or, you know, if you're shooting at a paper target to demolish, you know, whatever you're shooting at, the purpose is to demolish that thing or to kill that thing if it's a live thing. And the falling off of the lead is really just a byproduct. There is a difference there. Yes, Your Honor. Several things to mention there. First, of course, under the BNSF case of this circuit, intent for disposal is not relevant. But more importantly, and this goes to the discount question, two things to say about the discount question that answer Your Honor's question as well. First, there's no evidence of a discount in this record. Summary judgment was entered here, and all inferences should be resolved in the nonmoving party's favor. Secondly, to the extent there was any discount, and I disagree that there was one, that's an equitable factor, and that certainly can be taken into account in allocating responsibility for response costs. Thirdly, Your Honor, in response to the discount question, this is not a normal shooting range at all. This is a shooting range which had perchlorate in the soil, which we didn't know about. Contamination in the shooting range had been disc and graded. We didn't know about that. Lead and polyaromatic hydrocarbons were in the berm. We didn't know about that. Lead and perchlorates were found in the groundwater near the property. We didn't know about that. And there were metals and other contaminants in the woodpile. We didn't know about that. So this is not an ordinary shooting range. This is a poorly, poorly managed shooting range, which was left to go to seed, largely, in the river valley, the berm, and the woodpile, in which in the very area where there was some reclamation activity, two of the three major contaminants weren't even addressed. And to the extent there was any effort to do lead, you couldn't reach the deep lead. And on the surface lead, you made it worse by disking. So this is not a normal shooting range at all, Your Honor, and we didn't know that. Finally, Your Honor, let me very quickly address the Jiffy Lube question. Your Honor asked a direct question. Is the Jiffy Lube a facility? The answer is yes. We have, up to this point in this case, never had the district court or the defendant cite a single case in which a piece of real property was ever a facility. And certainly, if one follows the AMCAS decision and the Unaroyal decision, it should not be. As a matter of fact, in AMCAS, the court said that it would be, quote, an extremely strained reading of circler facilities, the term circler facility to include real property as a circler facility. If you look at the history of this case, it's even more true. This facility, the area here which was the shooting range, was operated as a shooting range twice, between 1965 and 1977. It was then closed. The operator, U.E. at the time, then abandoned the waste on site, walked away from the site. Baldwin then bought it, knowing it had been a shooting range. Baldwin operated the shooting range for seven years, closed it, walked away from the site, abandoned the waste. The permit to operate the site as a shooting range before we bought it was expired, and the Chula Vista City Ordinance, which prevented this property from being used as a shooting range, was inactive. And, Your Honor, going to the A&W Smelting case, which Your Honor has authored, there's an excellent definition of abandonment in there, which says the property is abandoned when the owner intends to divest himself of an interest in it. But here it was a foreclosure. Here, Your Honor, the Baldwins surrendered to an estate which was a lender. Indeed, in lieu of foreclosure, we bought at an open probate court sale a year later. But there's no question, in terms of what the defendants did, that both of these defendants allowed contamination to accumulate on this property and then abandoned it in Judge Krasinski's hands. But, Your Honor, when it's taken away from you against your will, just because you can't pay your bills, whether that's the same as abandoning? Well, it is, Your Honor, if you don't clean up the waste before you go. Yes, it is.  Now, we've asked the defendants to come participate in the cleaning up of their waste, and they haven't done so. They say it's not their responsibility. This is the clearest case of abandonment one can imagine. So, Your Honor, for all of those reasons, we ask that the district courts clear errors in law. And, by the way, the district court did what Mr. Franny just did. The district court, under the RCRA analysis, confused the regulatory definition of solid waste, which it applied in this case, with the statutory definition of solid waste, which should have been applied to this case, according to Connecticut Coastal Fishermen and according to this Court's precedent. Thank you very kindly for your attention. Thank you. That's all. You will stand submitted. We are adjourned.
judges: Kozinski, Kleinfeld, Rawlinson